## AFFIDAVIT OF BRIAN CONNERNEY

I, Brian Connerney, being duly sworn, state under oath as follows:

## INTRODUCTION

1.      I have been employed as an Arlington Police Officer since 2000.  I have held the rank of Inspector since 2005.  Since March of 2012, I have been assigned as a deputized Task Force Officer of the United States Drug Enforcement Administration ("DEA").  I am currently assigned to the Boston Office of the New England Field Division.

2.      As a Task Force Officer of the DEA, I am authorized to investigate violations of the law of the United States, including violations of the federal drug laws in Title 21 of the United States Code.  As a deputized DEA Task Force Officer, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      During my law enforcement career, I have received specialized training regarding the activities of drug traffickers, including the methods used to package, store, and distribute drugs, and the methods used by drug traffickers to conceal and launder the proceeds of their drug trafficking activities.

4.      In addition to my training, I have gained extensive experience in the investigation of the activities of drug traffickers.  Over the course of my assignment with the DEA and my career as a police officer in Arlington, Massachusetts, I have participated in numerous controlled substances investigations as a case agent and in a supporting role.  I have debriefed more than 100 defendants, informants, and witnesses with personal knowledge about drug trafficking

activities and the operation of drug trafficking organizations. I personally have participated in all aspects of drug trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, executing search warrants, and conducting court-authorized interceptions of wire and electronic communications.

5.　　Furthermore, while acting in an undercover capacity, I have made over 30 undercover purchases of controlled substances. These drug purchases included a wide-ranging assortment of controlled substances, including heroin, cocaine, oxycodone, and methamphetamine, and ranged in quantity from small "street-level" purchases to larger "trafficking" weight purchases. I have also interrogated numerous defendants and suspects who were users, sellers, and distributors of illegal controlled substances, and have also interviewed and debriefed cooperating witnesses and confidential informants concerning the distribution of illegal drugs.

6.　　On the basis of my training and experience, I am familiar with the vernacular of illegal drug abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

## PURPOSE OF AFFIDAVIT

7.　　I am submitting this affidavit in support of:

a.　　An application for the issuance of a search warrant authorizing the search of 557 Pleasant Street, Apartment 523, Malden, Massachusetts 02148 (hereinafter, "Target Location"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein;

b.　　An application for the issuance of a search warrant authorizing the search of a 2017 white Ford Explorer, bearing Vehicle Identification Number

("VIN") 1FM5K8GT6HGB18339 and Massachusetts registration 1JAX37 (hereinafter, the "Target Vehicle"), which is registered to David DESOUSA ("DESOUSA") at the Target Location. A complete description of the Target Vehicle to be searched is set forth in Attachment B, which is attached hereto and incorporated herein; and

c.     A criminal complaint charging DESOUSA, a/k/a "Derek," with distribution of and possession with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

8.     As further discussed below, there is probable cause to believe that: (a) DESOUSA sold methamphetamine to an undercover police officer ("UC") on February 26, 2020, March 12, 2020, and July 29, 2020; and (b) that DESOUSA used and is continuing to use the Target Vehicle to transport drugs and drug proceeds.

9.     As a result, I submit that there is probable cause to believe that the Target Location (which is DESOUSA's residence) and the Target Vehicle contain records and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; and (d) money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Location there is evidence of the Target Offenses, as described in Attachment C.  I further submit that there is probable cause to believe that within the Target Vehicle, there is evidence of the Target Offenses as described in Attachment D.

10.     Finally, as set forth below, I believe there is probable cause to believe that DESOUSA distributed and possessed with intent to distribute methamphetamine on February 26,

2020, March 12, 2020, and July 29, 2020, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

11.     I have personally participated in this investigation since February 2020.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of telephone and other records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agencies; and (d) my experience and training as a criminal investigator.

12.     Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Location and Target Vehicle, and that DESOUSA distributed and possessed with intent to distribute methamphetamine, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants and criminal complaint.  All times herein are approximate.

## PROBABLE CAUSE

### February 26, 2020:  DESOUSA used the Target Vehicle to meet with and sell methamphetamine to the UC and then returned to the Target Location.

13.     On February 25, 2020, at 11:10 a.m., the UC sent a text message to DESOUSA using (857) 246-2552 (hereinafter "the DESOUSA Phone") inquiring about obtaining an "onion," a common street term for one ounce of methamphetamine.  The UC had previously acquired DESOUSA's phone number and learned that DESOUSA was a source for methamphetamine.  Agents later confirmed that DESOUSA was using the DESOUSA Phone after conducting a controlled purchase of methamphetamine from him.  In response to the UC's inquiry about one ounce of methamphetamine, DESOUSA, replied, "1K," which the UC

understood to mean $1,000 was the price for one ounce of methamphetamine.  The UC and DESOUSA, using the DESOUSA Phone, continued to exchange text messages, including a message from DESOUSA saying, "I always got fire," which the UC understood to mean DESOUSA always had high quality drugs available.  The text messages between the UC and the DESOUSA Phone are preserved.

14.     On February 26, 2020, at 6:18 a.m., DESOUSA used the DESOUSA Phone to send a text message to the UC asking to meet that morning because DESOUSA spent most of the night at a casino.  The UC did not respond to this early morning message.  Later in the day, DESOUSA used the DESOUSA Phone to arrange meeting with the UC to complete the proposed methamphetamine sale.  During a subsequent phone call, DESOUSA expressed concern that the UC was working with law enforcement.  The UC assured DESOUSA that the UC was not working with law enforcement.

15.     At 1:06 p.m., the UC sent DESOUSA a text message to the DESOUSA Phone and made arrangements for the controlled purchase of methamphetamine to occur at a location in Arlington, Massachusetts.  Thereafter, the UC was equipped with an audio and video recording and surveillance device and provided with $1,000 of official agency funds for the controlled purchase.

16.     At 1:30 p.m., the UC and surveillance units observed DESOUSA arrive at the agreed-upon location in Arlington, Massachusetts.  DESOUSA was driving a 2018 white Land Rover Discovery, bearing Massachusetts Registration 1JAX37 (hereinafter "DESOUSA's Prior Vehicle").[1]  According to records from the Massachusetts Registry of Motor Vehicles,

---

[1]  On March 11, 2020, the Court authorized the use of a GPS tracking device on DESOUSA's Prior Vehicle.  *See* 20-mj-7052-JCB.

DESOUSA's Prior Vehicle was registered to DESOUSA and listed the Target Location for both DESOUSA's mailing and residential address.  A surveillance officer took video of the UC meeting with DESOUSA while the UC was in DESOUSA's Prior Vehicle.  The UC approached the driver's window of DESOUSA's Prior Vehicle.  DESOUSA was in the driver's seat and an unknown male was in the front passenger seat.  The unknown male passenger fixed his gaze on the UC throughout the interaction between the UC and DESOUSA.  The UC handed DESOUSA $1,000 of official agency funds.  DESOUSA then handed the UC a clear glassine bag containing a white crystalline substance.  The meeting between the UC and DESOUSA was successfully audio- and video-recorded.  After the controlled purchase, the UC observed DESOUSA's Prior Vehicle driving around the location of the controlled purchase.  I believe that this was an effort by DESOUSA to conduct counter-surveillance and identify law enforcement in the area after conducting the methamphetamine transaction.

17.     The UC later departed to a predetermined location and provided the clear glassine bag containing the white crystalline substance to other investigators and informed them that he received the substance from DESOUSA.  The substance was field-tested with presumptive positive results for methamphetamine.  Based upon my training and experience, the appearance and packaging of the substance, and the facts leading up to its acquisition, I believe the substance is methamphetamine.  The substance was sent to the DEA Northeast Regional Laboratory for analysis, which remains pending.

18.     After the controlled purchase, a surveillance officer observed DESOUSA's Prior Vehicle travel to the parking lot of the Target Location.  The Target Location is part of an elderly and disabled housing building operated by the Malden Housing Authority.  The surveillance officer observed DESOUSA and the unknown male enter the building of the Target Location.

**March 12, 2020: DESOUSA used the Target Vehicle to travel from the Target Location in order to meet with and sell two ounces of methamphetamine to the UC.**

19.     On March 12, 2020, the UC exchanged a series of text messages with DESOUSA, who was using the DESOUSA Phone, and arranged for the purchase of two ounces of methamphetamine.  These text messages are preserved.  During the exchange, DESOUSA stated, "I'm on my way to a driver safety course and won't be done til 10PM I can shoot your way right when I'm out tho."  The UC replied, "K I need 2 of what I got the last time," meaning two ounces of methamphetamine.  DESOUSA replied, "Ok I got u."  DESOUSA later stated, "I can do 1800 for 2 I gotta head to my spot to grab them tho cuz I don't carry that much on me."  Based on my training and experience, I believe that DESOUSA meant that he was willing to sell two ounces of methamphetamine for $1,800 but needed to go to the Target Location to retrieve that amount.  Shortly before 10:00 p.m., DESOUSA sent a text message stating, "I'll be home at 10:25 send me your address ima head right to u after I get there."  The UC provided a meeting location in Arlington, Massachusetts.  Thereafter, the UC was provided with $1,800 of official agency funds and an audio and video recording and surveillance device.

20.     At 10:22 p.m., an investigator observed DESOUSA's Prior Vehicle arrive at the building of the Target Location.  Data from the GPS tracking device affixed to DESOUSA's prior vehicle confirmed that the vehicle was in the area of the Target Location.  The investigator then saw DESOUSA enter the building.  At 10:26 p.m., the investigator observed DESOUSA exit the building, enter DESOUSA's Prior Vehicle, and then depart the area.  At 11:00 p.m., investigators observed DESOUSA's Prior Vehicle arrive at the agreed-upon location in Arlington, Massachusetts, where the UC was waiting on a sidewalk.  DESOUSA's Prior Vehicle approached the UC.  The UC then spoke with DESOUSA, who was operating the vehicle.  DESOUSA showed the UC two clear, glassine bags containing suspected methamphetamine.

Upon seeing the bags of suspected methamphetamine, the UC provided DESOUSA with the $1,800 of official agency funds.  DESOUSA then provided the two bags of suspected methamphetamine to the UC.  DESOUSA then departed the area in DESOUSA's Prior Vehicle.  The meeting between the UC and DESOUSA was successfully audio- and video-recorded.  The UC returned to a predetermined meeting location and provided investigators with the two glassine bags containing suspected methamphetamine and informed them that the suspected drugs were provided by DESOUSA.  The substance was field-tested with presumptive positive results for methamphetamine.  The drugs were then sent to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending.

### April 22, 2020: DESOUSA transferred his vehicle registration to the Target Vehicle

21.     On April 8, 2020, DESOUSA reported to Malden Police that someone had broken into DESOUSA's Prior Vehicle by smashing the rear windshield.  According to the police report, DESOUSA reported that some pills and his daughter's gold chain were stolen from the vehicle.  A few days after the motor vehicle break-in, DESOUSA's Prior Vehicle was taken to an auto-body shop, where it remained for several weeks.

22.     On April 22, 2020, DESOUSA transferred the registration of DESOUSA's Prior Vehicle to the Target Vehicle.  According to records at the Massachusetts Registry of Motor Vehicles, as of August 5, 2020, the Target Vehicle remains registered to DESOUSA with the Target Location listed as both the mailing and residential address for DESOUSA.[2]

---

[2]  On May 6, 2020, the Court issued a warrant authorizing the use of a GPS tracking device on the Target Vehicle.  This authorization to use the GPS tracking device on the Target Vehicle was extended on June 19, 2020 and again on July 31, 2020.  *See* 20-mj-7104-JCB.

**April 13, 2020: DESOUSA reported an attempted breaking and entering at the Target Location.**

23.     On April 13, 2020, at 12:15 a.m., Malden Police were dispatched to the Target Location because DESOUSA reported that two people were trying to break into his residence. The police report indicates that the DESOUSA resided at the Target Location, which I know is public housing maintained by the Malden Housing Authority.

24.     According to the police report, when officers responded, they detained two men in the hallway outside the Target Location.  Officers then spoke to DESOUSA, who reported that he was chased into the building of the Target Location by the two men.  DESOUSA stated that he entered the Target Location and locked the door.  The two men followed him to the Target Location and tried to push and pull the door open, but did not gain entry.  DESOUSA stated that he was in fear of one of the men (Male 1) because Male 1 had robbed DESOUSA of $55,000 two years ago.  DESOUSA never reported this previous robbery to the police.  DESOUSA further reported that he heard from friends that Male 1 was out to rob DESOUSA again.  Officers then spoke to Male 1 who stated that he was having a problem with DESOUSA and wanted to "resolve it."  Malden Police Officers arrested the two men for trespassing and attempted breaking and entering into the Target Location.

**DESOUSA has repeatedly used the Target Vehicle to conduct suspected drug transactions.**

25.     Data from the GPS tracking device attached to the Target Vehicle from May 7, 2020 to at least the end of July 2020 established that DESOUSA regularly used the Target Vehicle to drive throughout the greater Boston area, as far as Rhode Island, and that the Target Vehicle regularly made several brief stops along the way.  Based upon my training and experience, as well as my participation in this investigation (including my knowledge of

DESOUSA's conduct during the methamphetamine sales to the UC), I believe that this pattern of activity is consistent with DESOUSA using the Target Vehicle to meet with customers for the purpose of conducting hand-to-hand drug transactions.

26.     An example of such behavior was observed by surveillance on June 10, 2020.  On that date, data from the GPS device attached to the Target Vehicle indicated that the Target Vehicle was headed in the direction of North Providence, Rhode Island.  At 3:32 p.m., data from the GPS device attached to the Target Vehicle indicated that the vehicle was in the area of 395 Angell Road, North Providence, Rhode Island.  Data from the GPS device indicated that the Target Vehicle was parked at this location for a very brief period before the Target Vehicle headed back to the Boston, Massachusetts area.[3]

27.     Later, between 5:03 and 5:14 p.m. on June 10, 2020, investigators observed DESOUSA in the Target Vehicle in a public parking lot of a fast food restaurant in Saugus, Massachusetts.  DESOUSA exited the Target Vehicle and had a brief interaction with an unknown individual at the front of the business.  DESOUSA then returned to the Target Vehicle. Investigators did not observe DESOUSA to be carrying any items consistent with a purchase from the restaurant as he returned to the Target Vehicle.  DESOUSA then drove the Target Vehicle to the direction of the Target Location, where investigators observed the Target Vehicle at 5:30 p.m.

---

[3] This data is consistent with observations made by surveillance officers on April 6, 2020 where officers followed DESOUSA drive to 395 North Angell Road in North Providence, Rhode Island.  Upon his arrival, investigators observed an individual meet with DESOUSA in DESOUSA's Prior Vehicle for a short period of time.  Thereafter, the individual went into the residence at 395 Angell Road and DESOUSA drove back toward the Boston, Massachusetts area.

28.     Shortly before 7:00 p.m. on June 10, 2020, investigators observed DESOUSA

drive the Target Vehicle away from the building of the Target Location.  Data from the GPS

device attached to the Target Vehicle indicated that the Target Vehicle went to the area of Main

Street and Chrystal Street in Wakefield, Massachusetts, where the vehicle stayed for a brief

period of time before going back to the building of the Target Location.

29.     At 8:30 p.m. on June 10, 2020, investigators observed DESOUSA drive the

Target Vehicle away from the building of the Target Location.  DESOUSA drove the Target

Vehicle a short distance to a remote area in Medford, Massachusetts.  According to officers with

the Medford Police Department Drug Control Unit, this location is known to be frequented by

individuals involved in the illegal use and distribution of controlled substances.  An unidentified

individual approached the Target Vehicle and met with DESOUSA for a very brief period of

time.  DESOUSA then drove the Target Vehicle away from the area.

30.     DESOUSA then drove the Target Vehicle to a Mobil gas station/convenience

store in Stoneham, Massachusetts.[4]  At 8:41 p.m., DESOUSA exited the Target Vehicle and

entered the convenience store portion of the gas station.  An unknown individual followed

DESOUSA into the store, and both individuals went to the rear of the store.  A short time later,

DESOUSA and the other individual proceeded to the front of the store where they proceeded to

make a small purchase.

---

[4] On multiple prior occasions, investigators have observed (and data from the GPS
device attached to the Target Vehicle has confirmed) that DESOUSA has gone to this Mobil gas
station/convenience store in Stoneham, Massachusetts, to make minor purchases rather than stop
at a more conveniently located Mobil gas station/convenience store in the North Medford,
Massachusetts.  Based upon my training and experience, as well as my participation in this
investigation, I believe that DESOUSA is using the Mobil gas station/convenience store in
Stoneham, Massachusetts as a meeting location to conduct hand-to-hand drug transactions.

31.     DESOUSA then drove the Target Vehicle to Winchester, Massachusetts, where, at 8:51 p.m., he parked the Target Vehicle on Washington Street near the intersection of Nelson Street.  A short while later, an unidentified male entered the Target Vehicle.  DESOUSA then drove the Target Vehicle to a convenience store and stopped briefly.  DESOUSA then drove the Target Vehicle to a Santander Bank ATM at 7 Church Street in Winchester, Massachusetts, where the unidentified male exited the Target Vehicle, used the ATM machine, and then got back into the Target Vehicle.  DESOUSA then drove the Target Vehicle back to the intersection of Washington Street and Nelson Street in Winchester, Massachusetts, where, at 9:05 p.m. the unknown male exited the Target Vehicle.

32.     Later that same night at 9:19 p.m. (on June 10, 2020), data from the GPS device attached to the Target Vehicle indicated that the Target Vehicle arrived at the intersection of Massachusetts Avenue and Melnea Cass Boulevard in Boston, Massachusetts, an area well-known by law enforcement officers to be an area frequented by drug users and an area where distribution of controlled substances regularly occurs.  The Target Vehicle stayed in this area a short while and then traveled to and through East Somerville, Massachusetts, where it again stopped for a brief while.  The Target Vehicle then returned to the building of the Target Location at 10:34 p.m.

33.     Based upon my training and experience, as well as my participation in this investigation (including my knowledge of DESOUSA's conduct during the methamphetamine sales to the UC), I believe that this pattern of activity on June 10, 2020, is consistent with DESOUSA using the Target Vehicle to meet with customers for the purpose of conducting hand-to-hand drug transactions.

**July 29, 2020: DESOUSA used the Target Vehicle to travel from the Target
Location and meet with various individuals, including the UC, and DESOUSA sold
the UC one ounce of methamphetamine.**

34.      On July 29, 2020, at 5:00 p.m., the UC contacted the DESOUSA Phone in order

to arrange the purchase of one ounce of methamphetamine.  After greeting one another, the UC

and DESOUSA exchanged text messages regarding the current price of one ounce of

methamphetamine.  The text messages between the UC and the DESOUSA Phone are preserved

and excerpted below:

35.      The UC stated, "Hey [Name] from Arl are u delivering."  Based upon my training

and experience, this coded language is common for a drug user to determine the availability of a

drug dealer.  DESOUSA replied, "Yeah i am but gotta meet 2 people first then i come see u.

Where u been?"  The UC responded, "I finally had my surgery this fucken virus thing pushed

back my surgery. I need an onion what ca [sic]. Can u do for me?"  DESOUSA answered,

"Damn man i don't even wanna tell u the numbers cuz their so high. There's been a drought so

I've been paying 3-4 times what i was before. I'm selling balls for 400. I try not to sell onions but

let me think of a fair number."  The UC stated, "Ok make it quick in case i have to grab some

more do rei me."  DESOUSA responded, "Bro i hate to even ask for it but lowest i can do is 2…

that's close to what I'm paying and I'm making 3400 one selling balls anyways."  Based on my

training and experience, I understood the reference "2" to mean $2,000 for one ounce of

methamphetamine.  I also know that "balls" is a slang term meaning one-eighth of an ounce of a

controlled substance.  I believe that DESOUSA told the UC that DESOUSA was making $3,400

per ounce of methamphetamine by selling it in one-eighth of an ounce quantities.

36.      The UC agreed, "It is what it is just do me better in the future i will do the 2.

What time because i have plans."  DESOUSA answered, "The second the price drops i will drop

it accordingly and not gonna lie i can be at your house at 6:45." Thereafter, the UC and

DESOUSA agreed to meet at a designated location in Arlington, Massachusetts. DESOUSA

also indicated to the UC that he needed to meet two customers before meeting with the UC.

37.     Prior to the meeting with DESOUSA, the UC was equipped with an audio and

video recording and surveillance device and was provided with $2,000 of official agency funds.

Agents established surveillance in the area of the Target Location and observed the Target

Vehicle parked outside the Target Location. At 5:25 p.m., agents observed DESOUSA exit the

building of the Target Location and enter the Target Vehicle. Surveillance units followed the

Target Vehicle and observed DESOUSA stop and conduct three separate, brief meetings during

which he engaged in quick hand-to-hand transactions with three different individuals. These

meetings occurred in Stoneham, Massachusetts, Woburn, Massachusetts, and Salem, New

Hampshire. Based upon my training and experience and knowledge of this investigation, I

believe that DESOUSA met with customers to conduct hand-to-hand drug transactions.

38.     Shortly before 7:00 p.m., the UC received a text message from the DESOUSA

Phone stating, "3 mins away." A brief time thereafter, surveillance agents and the UC observed

DESOUSA driving the Target Vehicle as he approached the agreed-upon meeting location.

DESOUSA was alone in the Target Vehicle. Upon DESOUSA's arrival, the UC approached the

front passenger window of the Target Vehicle. In response, DESOUSA placed the window

down and greeted the UC. While conversing with DESOUSA, the UC observed DESOUSA

place a clear glassine bag containing an off-white, rock-like substance, suspected to be

methamphetamine, on the front passenger's door arm rest. The UC then provided DESOUSA

with the $2,000 of official agency funds. In exchange, DESOUSA provided the UC with the bag

of suspected methamphetamine. After the transaction, the UC expressed a desire to purchase

two to three ounces of methamphetamine from DESOUSA the following week.  DESOUSA

indicated that he could fulfill the order, but would need to think of a fair price for that amount of

methamphetamine.  DESOUSA and the UC agreed to speak again at a later time.  The UC and

DESOUSA then parted ways.  The meeting between the UC and DESOUSA was successfully

audio- and video-recorded.

      39.    The UC then went to a pre-determined meeting location and provided the bag of

suspected methamphetamine to other agents and stated that DESOUSA had provided the

suspected drugs to the UC.  The substance was field-tested with presumptive positive results for

methamphetamine.  The substance was transported to the DEA field division office for

safekeeping and will be packaged and transported to the DEA Northeast Regional Laboratory for

confirmatory analysis.

### Preliminary analysis of DESOUSA's financial records reflect transactions that are believed to relate to drug trafficking activity and money laundering

      40.    DESOUSA maintains a Bank of America checking account.  Records for his

account were reviewed for the period between December 9, 2017 and March 11, 2020.

Additional Bank of America records were requested on July 24, 2020, but have not yet been

received.  The Target Location is the mailing address for DESOUSA's account statements.

During the two-plus year period, deposits into DESOUSA's checking account totaled $212,629,

which included $75,179 in cash deposits.  DESOUSA also received $95,770 in electronic peer-

to-peer transfers processed through Facebook, Zelle, Apple Cash, Paypal, Square, and Venmo.

Disbursements from DESOUSA's checking account totaled $203,787, which included $100,615

in cash withdrawals.  Based on my training and experience, I believe that these cash withdrawals

were necessary to liquidate the funds that were sent to him via electronic peer-to-peer transfers.

41.     In November 2019, DESOUSA purchased DESOUSA's Prior Vehicle for $38,500.  DESOUSA made a $20,000 down payment at the time of purchase, which included two Bank of America cashier's checks for $9,000 each that DESOUSA had purchased with cash. DESOUSA financed the remaining vehicle cost through Ally Bank.  DESOUSA's auto loan statements were mailed to the Target Location.  Despite having a six-year payment window to repay the loan, DESOUSA paid the loan in full over five payments made between January and March 2020.  The auto loan payments were derived from DESOUSA's Bank of America checking account and were preceded by structured cash deposits under $10,000.  In May 2020, DESOUSA traded-in DESOUSA's Prior Vehicle and purchased the Target Vehicle.

42.     DESOUSA's Bank of America account does not receive any deposits from wages. His account shows social security/disability payments in the name of his mother.  Based upon my training and experience, my knowledge of this investigation, and the fact that DESOUSA's bank account receives no wages, I believe that the cash deposits and peer-to-peer transfers into his Bank of America account are derived from DESOUSA's drug trafficking activities.  I further believe that the cash withdrawals and the purchase of DESOUSA's Prior Vehicle is inconsistent with him having no wages and living in public housing, and is instead consistent with DESOUSA's money laundering activities to conceal evidence of his drug proceeds.

### Drug Traffickers' Use of Residences, Vehicles, and Cell Phones Generally

43.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences and vehicles of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and vehicles:

    a.   Controlled substances.

b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact

lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

44.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences and vehicles records relating to their drug trafficking activities.  Drug traffickers store records of their drug dealing in their vehicles because they typically use their vehicles as a place of business both to receive and transport drugs and drug proceeds.

45.     Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

46.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence and/or their vehicle.  Such documents include rental or storage property agreements and receipts.

47.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers also typically transport money to purchase controlled substances or drug proceeds in their vehicles.

48.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

49.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence or in their vehicle do not discover these materials.  Similarly, drug traffickers try to hide drugs, cash, and records related to their drug trafficking and money laundering activities in hidden or secret compartments within their vehicles.

50.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises or subject vehicle.  It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant others.  This is done in an effort to thwart law enforcement detection.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of controlled substances is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

51.     Based on my training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of

20

electronic surveillance.  Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug traffickers' residences.

52.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

53.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as

consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that drug traffickers regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments C and D on their cellular telephones.

54.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via telephone, text messages, and the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying

offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

55.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

56.     I know from my training and experience, that many cellular telephones now offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called a biometric lock.

57.     If a user enables the biometric lock, he or she can register fingerprint(s) that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's fingerprint sensor.  In my training and experience, users of biometric locks often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

58.     In some circumstances, a fingerprint cannot be used to unlock a device that has a biometric lock enabled, and a passcode must be used instead. For example, if the device has not been unlocked for a period of time, or due to a periodic requirement to use the passcode.  Thus, in the event law enforcement encounters a locked smartphone device, the opportunity to unlock the device via the fingerprint sensor exists only for a short time.  A biometric lock may also not work to unlock the device if for example, (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

59.     I am also aware that even more recent smartphone devices no longer use a biometric lock and instead use a facial recognition security feature.  Facial recognition systems use the smartphone's camera to scan the face of the user and, if the scan matches the data on file, performs actions like unlocking the smartphone.

60.     The passcodes that would unlock these devices are not known to law enforcement.  Thus, it may be necessary to press the fingers of the user of the device to the device's fingerprint sensor or use the device's camera to access the facial recognition security feature in an attempt to unlock the device for the purpose of executing the search authorized by these warrants.  Attempting to the unlock device with the use of the fingerprints of the user or use the device's camera and take a scan of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the search authorized by these warrants.

61.     Based on the facts discussed in this affidavit, I believe that DESOUSA is the primary user of the DESOUSA Phone ((857) 246-2552) and thus either his fingerprints will be necessary to unlock the device or use of the device's camera to scan DESOUSA's face will be necessary to unlock the device.  I intend to call the DESOUSA Phone when searching the Target Location and Target Vehicle.  If a smartphone device rings, and DESOUSA is present, I request authority to place his fingers on the fingerprint sensor, if one exists, to unlock the device and/or use the camera on the device to scan DESOUSA's face to unlock the smartphone.

62.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment C will be found at the Target Location described in Attachment A, and items set forth in Attachment D will be found in the Target Vehicle, described in Attachment B.

## **CONCLUSION**

63.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Location, as described in Attachment A, and the Target Vehicle, as described in Attachment B there exist evidence, fruits,

and instrumentalities of drug distribution activities as set forth in Attachments C and D, respectively. Accordingly, I respectfully request that search warrants be issued for the search of the residence and vehicle described in Attachments A and B, for the items respectively detailed in Attachments C and D.

64.     Further, based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that on February 26, 2020, March 12, 2020, and July 29, 2020, DESOUSA possessed with intent to distribute and distributed methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Accordingly, I respectfully request that a criminal complaint charging DESOUSA with violations of 21 U.S.C. § 841(a)(1) be issued.

65.     Disclosure of the contents of the applications, affidavit, search warrants, and complaint could compromise and jeopardize this ongoing investigation by allowing DESOUSA to flee and/or destroy evidence. For that reason, I request that the applications, affidavit, search warrants, and complaint be sealed until further order of the Court.

Respectfully submitted,

_____

Brian Connerney
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this the 6th day of August, 2020.

_____

Hon. Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts

26

## ATTACHMENT A

### (Location to be searched)

557 Pleasant Street, Apartment 523, Malden, Massachusetts 02148 (the "Target Location") is an apartment within 557 Pleasant Street, Malden, Massachusetts, a multi-unit residential building. The building consists of five residential floors with 172 residential units. The number 557 is prominently displayed at the front entrance of the building. The building is owned and maintained by the City of Malden Housing Authority.

Apartment 523 is on the fifth-floor of the building and has the number 523 affixed to the apartment door leading into the residence to be searched. Photographs of the front of 557 Pleasant Street, Malden, Massachusetts and the door of Apartment 523 are attached.

 

**ATTACHMENT B**

**(Vehicle to be searched)**

A 2017 white Ford Explorer, bearing Vehicle Identification Number ("VIN")

1FM5K8GT6HGB18339 and Massachusetts registration 1JAX37 (the "Target Vehicle").

**ATTACHMENT C**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.  From February 2020 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3.  Cash, currency, and currency counting machines, and records from February 2020 to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.  From February 2020 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.  From February 2020 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases,

rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.     Cellular telephones, computers, and other electronic storage media belonging to or used by David DESOUSA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

   a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b.     From February 2020 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.     From February 2020 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d.     From February 2020 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

   e.     From February 2020 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f.     From February 2020 to the present, GPS data;

   g.     From February 2020 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h. From February 2020 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location and Target Vehicle described in these warrants, law enforcement personnel are authorized to press the fingers (including thumbs) of David DESOUSA to the fingerprint sensor of the device found at the Target Location and/or Target Vehicle and/or use the camera of the cellular telephone to scan the face of David DESOUSA for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants.  **This authorization with respect to use of the fingerprint sensor and camera is limited to the device associated with telephone number (857) 246-2552 used by David DESOUSA.**

## ATTACHMENT D

### (Items to be Seized from Target Vehicle)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses")

1. Cash and currency relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.

2. Cellular telephones, computers, and other electronic storage media belonging to or used by David DESOUSA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b. From February 2020 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. From February 2020 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d. From February 2020 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

   e. From February 2020 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f. From February 2020 to the present, GPS data;

g.      From February 2020 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.      From February 2020 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location and Target Vehicle described in these warrants, law enforcement personnel are authorized to press the fingers (including thumbs) of David DESOUSA to the fingerprint sensor of the device found at the Target Location and/or Target Vehicle and/or use the camera of the cellular telephone to scan the face of David DESOUSA for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants. **This authorization with respect to use of the fingerprint sensor and camera is limited to the device associated with telephone number (857) 246-2552 used by David DESOUSA.**